[923 NYS2d 11]

For the People Theatres of N.Y., Inc., Doing Business as Fair Theater, Plaintiff, and JGJ Merchandise Corp., Doing Business as Vishans Video, Also Known as Mixed Emotions, Appellant, v City of New York et al., Respondents. Ten's Cabaret, Inc., et al., Appellants, v City of New York et al., Respondents.

First Department, April 7, 2011

## APPEARANCES OF COUNSEL

*Fahringer & Dubno,* New York City (*Herald Price Fahringer, Erica L. Dubno* and *Nicole Neckles* of counsel), for JGJ Merchandise Corp., appellant.

*Zane & Rudofsky,* New York City (*Edward S. Rudofsky* of counsel) for Ten's Cabaret, Ltd., and others, appellants.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Elizabeth S. Natrella, Leonard Koerner, Robin Binder* and *Sheryl Neufeld* of counsel), for respondents.

## OPINION OF THE COURT

Acosta, J.

This challenge to the constitutionality of the 2001 Amendments to New York City Zoning Resolution § 12-10, which placed certain restrictions on adult establishments, presents two significant issues. The first is whether the City established that certain nightclubs fitting the technical definition of "60/40" establishments retained a predominant focus on sexually explicit activity, and thus, that the amendments were constitutional. If this first issue is resolved in the affirmative, then the second must be addressed—whether the 2001 Amendments to the Zoning Resolution were constitutional on an as-applied basis.

Background

Before 1995, New York City made no distinction between adult entertainment and nonadult entertainment, as the Zoning Resolution of December 15, 1961 allowed adult entertainment businesses to coexist with other uses. In 1993, the New York City Department of City Planning (DCP) began a comprehensive assessment of the impact of adult establishments. That effort culminated with the release of the "Adult Entertainment Study" in 1994 (DCP Study). Based on the material before it, the DCP concluded that adult entertainment establishments, particularly those concentrated in specific areas, tended to produce negative secondary effects such as increased crime, decreased property values, reduced commercial activities, and erosion of community character.

In response to the DCP Study, the City adopted an Amended Zoning Resolution in 1995 (1995 Resolution), which barred adult businesses from all residential zones and most commercial and manufacturing districts (Amended Zoning Resolution § 32-01 [a]; § 42-01 [b]). The 1995 Resolution defined an "adult establishment" as a commercial establishment in which a "substantial portion" of the establishment includes "an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof" (Text Amendment N 950384 ZRY [No. 1322]).[1] Notably, the 1995 Resolution placed particular emphasis on the presence of "specified sexual activities" and/or "specified anatomical areas" in determining whether an establishment was of an adult character.[2]

---

1. The 1995 Resolution survived a facial challenge brought by adult establishments (see *Stringfellow's of N.Y. v City of New York*, 91 NY2d 382, 397, 399 [1998] [holding that the 1995 Resolution was not "purposefully directed at controlling the content of the message conveyed through adult businesses," but was aimed at the separate societal goal of ameliorating the adverse social consequences of proliferating adult uses]).

2.

"Section 12-10 of the Zoning Resolution also further defined the terms used in the above section as follows: '[S]pecified sexual activities' are '(1) human genitals in a state of sexual stimulation or arousal; (2) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (3) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast.' 'Specified anatomical areas' are '(1) less than completely and opaquely concealed: (i) human genitals, pubic region, (ii) human buttock, anus, or (iii) female breast below a point immediately above the top of the areola; or (2) human male genitals

Some time thereafter, the City Planning Commission (CPC) determined "substantial portion" to be defined as 40%, and made it clear that any commercial establishment with "at least 40 percent of its accessible floor area used for adult purposes qualifies as an 'adult establishment' or 'adult bookstore.'" After the 60/40 formula became the governing standard, adult businesses altered their character to ensure that they did not qualify as "adult establishments" within the meaning of the City's zoning law. Following unsuccessful claims against adult businesses for "sham compliance" on the basis of the Nuisance Abatement Law,[3] the New York City Council adopted and ratified Text Amendment N 010508 ZRY to the Zoning Resolution in 2001 (the 2001 Amendments). To include those establishments that had superficially complied with the 60/40 formula but remained essentially adult establishments, the amended definition included a provision clarifying that nonadult material shall not be considered stock-in-trade for the purpose of the "substantial portion" analysis where one or more of the following features were present: (1) customers had to pass through adult material to reach the nonadult section; (2) any material exposed one to adult material; (3) nonadult material was only for sale, while adult material was for sale or rent; (4) more adult printed materials were available than nonadult ones; (5) minors were restricted from the entire store or from any section offering nonadult material; (6) signs or window displays of adult matter were disproportionate to signs and window displays featuring nonadult matter; (7) "[o]ne or more individual enclosures" were available for viewing adult movies or live performances; and (8) purchasing nonadult material exposed the buyer to adult material.

On or about October 1, 2002, Ten's Cabaret commenced an action against the City, seeking, among other things, a declaratory judgment declaring the 2001 Amendments to be unconstitutional and invalid and also seeking a permanent injunction against their enforcement. At the same time, the plaintiff moved for a preliminary injunction preventing the City from enforcing the amendments. On October 1, 2002, Supreme Court (Faviola Soto, J.) granted a temporary restraining order against enforcement of the amendments against Ten's Cabaret. On October 18,

---

in a discernibly turgid state, even if completely and opaquely concealed'" (*City of New York v Stringfellow's of N.Y.*, 96 NY2d 51, 55 n 2 [2001]).

**3.** *See City of New York v Les Hommes*, 94 NY2d 267, 273 (1999).

2002, three other 60/40 establishments—Pussycat Lounge, Inc., doing business as Pussycat Lounge; Church Street Café, Inc., doing business as BabyDoll; and 62-20 Queens Boulevard Inc., doing business as Nickels—commenced an action similar to the one Ten's had commenced. The three plaintiffs moved by order to show cause for a temporary restraining order, which Supreme Court (Faviola Soto, J.) granted, and to consolidate their action with Ten's, on the ground that the two actions were substantively identical. The two actions were consolidated by stipulation on May 12, 2003.

Additionally, two other 60/40 establishments—For the People Theatres of N.Y., doing business as Fair Theater, and JGJ Merchandise Corp., doing business as Vishans Video, also known as Mixed Emotions—also brought similar actions. Both plaintiffs sought a judgment declaring the 2001 Amendments unconstitutional and unenforceable as well as a preliminary injunction. By order entered October 30, 2002, Supreme Court (Louis B. York, J.) enjoined the enforcement of the 2001 Amendments "to the same extent as the temporary restraining order issued in *Pussycat Lounge v City of New York*."

In a decision dated September 9, 2003, Supreme Court granted summary judgment in favor of the plaintiffs in the *Ten's Cabaret* action (*Ten's Cabaret v City of New York*, 1 Misc 3d 399 [Sup Ct, NY County 2003]). In so doing, the court concluded that defendants did not meet their burden under the First Amendment, or show that the 2001 Amendments were justified by concerns unrelated to speech. On the same date, Supreme Court issued a decision in *For the People*, finding, as it had in *Ten's Cabaret*, that the City had failed to meet its constitutional burden to permit the court to uphold the amendments (*For the People Theatres of N.Y. v City of New York*, 1 Misc 3d 394 [Sup Ct, NY County 2003]).

*Ten's Cabaret* and *For the People* were consolidated for the purposes of appeal to this Court, which reversed the Supreme Court's judgments (20 AD3d 1 [2005]). In its decision, this Court found that no new "secondary impacts" study was required absent a showing that the essential nature of the 60/40 businesses had changed (*id.* at 17-18).

On appeal, the Court of Appeals modified this Court's decision, finding that the action should be remitted for a hearing (*For the People Theatres of N.Y., Inc. v City of New York*, 6 NY3d 63 [2005]). In so doing, it held that the plaintiffs had disputed the factual findings underlying the City's 2001 Amendments,

and had submitted expert affidavits, along with other documents, supporting their arguments (*id.* at 82-83). The Court explained that "[b]ecause plaintiffs have thus 'furnish[ed] evidence that disputes the [City's] factual findings,' the burden shifted back to the City 'to supplement the record with evidence renewing support for a theory that justifies its ordinance' " (*id.* at 83, quoting *Los Angeles v Alameda Books, Inc.*, 535 US 425, 439 [2002]). It noted, however, that "[t]he City was not required . . . to relitigate the secondary effects of adult uses, or to produce empirical studies connecting 60/40 businesses to adverse secondary effects" (*id.*). Rather, the Court held,

> "a triable question of fact has been presented as to whether 60/40 businesses are so transformed in character that they no longer resemble the kinds of adult uses found, both in the 1994 DCP Study and in studies and court decisions around the country, to create negative secondary effects—as plaintiffs contend—or whether these businesses' technical compliance with the 60/40 formula is merely a sham—as the City contends" (*id.* at 83-84).

The Court explained that

> "[i]n addressing this factual dispute, we anticipate that the City will produce evidence relating to the purportedly sham character of self-identified 60/40 book and video stores, theaters and eating and drinking establishments or other commercial establishments located in the city. This does not mean that the City has to perform a formal study or a statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city. If the trier of fact determines, after review of this evidence, that the City has fairly supported its position on sham compliance—i.e., despite formal compliance with the 60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit materials or activities, and thus their essential nature has not changed—the City will have satisfied its burden to justify strengthening the 1995 Ordinance by enacting the 2001 Amendments, and will be entitled to judgment in its favor. If not, plaintiffs will prevail on their claim that the 2001 Amendments are insufficiently narrow and therefore violate their free speech rights. In that event,

plaintiffs will be entitled to judgment and a declaration that the 2001 Amendments are unconstitutional." (*Id.* at 84.)

On remittitur, both the *Ten's Cabaret* and *For the People* plaintiffs moved for a preliminary injunction; Justice York granted both those motions. The cases were then tried separately, with the *For the People* trial taking place on January 12 through 22, 2009 and the *Ten's Cabaret* trial taking place February 23 through March 2, 2009.

In *For the People*, Supreme Court, by a decision dated March 29, 2010, later amended on April 8, 2010, upheld the amended definition of "adult establishment" as constitutional insofar as it concerned "adult bookstores," but declared it invalid insofar as it concerns "adult theaters" (27 Misc 3d 1079 [2010]). In so doing, the court undertook "the task of determining whether . . . the City substantially showed that the conversion to 60/40 status is a sham because the ongoing predominant focus o[f] these self-identified 60/40 entities is on sexually explicit materials" (*id.* at 1085). Supreme Court then detailed the evidence at trial, noting that the City "inspected 15 self-identified 60/40 businesses," and described the evidence in "shortened" form (*id.* at 1086). The court then denied plaintiffs' motion to dismiss for failure to prove a prima facie case, given the City's alleged failure to show that the "60/40" entities for which it presented evidence were "in fact" 60/40 compliant (*id.* at 1088). Supreme Court found that the Court of Appeals had used the term "self-identified" establishments, and that these establishments would not be located in these particular areas were they not actual 60/40 businesses. The court stated that

> "this decision is not being made against a blank slate . . . Keeping in mind that the City's burden was a 'light' one, it had only to establish that the conversion of 100% adult entities to 60/40 status [from 100% adult entities] was a sham because their continuing ongoing focus is on adult material. Thus, their essential nature as adult establishments has not changed and no new study had to be undertaken to determine whether 60/40 entities had a deleterious effect on their surrounding environs.
>
> "Moreover, the City was directed that substantial evidence was all that was necessary to satisfy its burden. This burden is consistent with prior high-

court determinations in adjudicating the standard by which the constitutionality of statutes and regulations regulating speech has been decided. While the content of speech cannot be regulated, the time, place and manner can be as a legitimate exercise of the state's police power.

"While the plaintiffs may have introduced evidence that the essential nature of these entities has changed, it is also true that the defendants have provided substantial evidence that their dominant, ongoing focus is on adult matters. Therefore, the defendants have satisfied their 'light' burden with regard to bookstores and video stores." (*Id.* at 1088-1089 [citations omitted].)

However, Supreme Court was

"not convinced that the same holding applie[d] to the two adult movie theaters in [the] action. The admittedly large number of peep shows in one theat[er] and the payment of one admission in both theat[er]s [that] allows a patron to see all of the movies, both adult and nonadult, do not rise even to the low level of substantial evidence" (*id.* at 1089).

On May 19, 2010, Supreme Court entered judgment in the City's favor upholding the 2001 definition of "adult bookstore" as constitutional, but striking the definition of "adult theater." The City does not challenge the "adult theater" portion of the ruling on appeal.

In *Ten's Cabaret*, Supreme Court awarded judgment to the City upholding the 2001 Amendments. The court framed the issue as, "have these 60/40 establishments so changed in nature that they no longer resemble the pre-1995 100 percent entities that prevailed in the City before the 1995 amendments were enacted?" (*Ten's Cabaret, Inc. v City of New York*, NYLJ, Apr. 19, 2010, at 34, col 1 [Sup Ct, NY County, York, J.].) Supreme Court then stated:

"To make out a prima facie case, the Court of Appeals held, the City did not have to conduct any further surveys or inspections of 60/40 clubs. Its 'light burden' was to show that the essential character of these clubs and bars has not changed, to wit, that their predominant focus continues to be on topless dancing, even though the topless dancing may take

in less than 40 percent of the club's accessible floor space.

"Merely because defendants have introduced evidence that some topless clubs may not have an ongoing focus on adult activities, does not defeat the pattern established by defendant of topless clubs having an ongoing focus of adult activities.

"Although the plaintiffs have devoted quite a substantial portion of their brief to proving that these reconstituted 60/40 clubs no longer resemble their pre-1995 forbears, this argument is entirely irrelevant and will be accorded no weight. The [remittitur] to the trial court posed the question: did these 60/40 clubs so change that their dominant ongoing focus was no longer on sexual matters so that the studies establishing the 1995 amendments no longer applied to them? The Court of Appeals held that the City did not have to engage in empirical studies or to establish the secondary effects of 60/40 clubs and bars to satisfy its burden." (*Id.* [citations ommitted].)

The plaintiffs appealed the judgments in *For the People* and *Ten's Cabaret*. We now reverse and remit the matter for further proceedings consistent with this opinion.

Facial Challenge

In assessing the constitutionality of the City's ordinance, the Court of Appeals adopted the analytical structure of *Los Angeles v Alameda Books, Inc.* (535 US 425 [2002]).[4] In so doing, the Court established the DCP Study, as well as other studies and court decisions from across the country, as the basis for assessing the plaintiffs' claim that 60/40 businesses no longer continue to resemble the kinds of adult uses that were shown to cause

---

**4.** In *Los Angeles v Alameda Books, Inc.*, the Supreme Court voted 5-4 to uphold the Los Angeles ordinance, with Justice O'Connor writing for a plurality of four Justices, Justice Kennedy concurring in the result only, and Justice Souter writing for the dissent.

As a result of this divided ruling, "Justice Kennedy's opinion, and the relevant parts of the plurality opinion with which he agreed, are controlling on the issue of what a municipality must demonstrate in order to sustain a zoning ordinance regulating adult businesses in the face of a First Amendment challenge" (*For the People,* 6 NY3d at 79).

negative secondary effects (*see For the People*, 6 NY3d 63).[5] In relying upon the DCP Study as well as other studies and court decisions from across the country, the City is not required to re-litigate the issue of secondary effects of adult uses or produce additional empirical studies on 60/40 businesses (*see id.* at 80-81). To prevail, however, the City needs to show that "the evidence relied upon is reasonably believed to be relevant to the problem that the city addresses" (6A McQuillin, Municipal Corporations § 24:127, at 456 [3d rev ed]). That is, it must establish that the essential characteristics or features of the 60/40 uses are very similar to those adult uses that were previously found to cause secondary effects. In order to find the ordinance constitutional, a court must have "more conviction of the connection between legislative ends and means than [is required by] the rational basis standard, but only in the sense of evidence . . . [that] is reasonably believed to be relevant to the secondary effects in question" (*For the People*, 6 NY3d at 81 [citations and internal quotation marks omitted]).[6]

■ In its extremely terse decision, Supreme Court did not elaborate on the criteria by which it determined that the plaintiffs' essential nature was similar or dissimilar to the sexually explicit adult uses that were analyzed in the DCP Study or other studies and case law from across the country. Moreover, it failed to state the particular facts on which it based its judgment. Supreme Court simply detailed the City's evidence and arrived at legal conclusions. This was insufficient to answer the question posed on remittitur from the Court of Appeals— namely, whether the 60/40 establishments are similar in nature to adult establishments that have been shown by means of empirical data to cause negative "secondary effects." As Supreme Court did not provide any direction for the parties or this Court to adequately review, analyze, or understand the ruling, its decision is "manifestly inadequate" and violates the dictates of CPLR 4213 (b).

---

**5.** In dispensing with the need for additional formal studies and statistical analysis, the Court of Appeals simplified the nature of the proof that the City could use to defend the constitutionality of the 2001 Amendments.

**6.** In other words, the City's evidence is subject to intermediate scrutiny (*see Los Angeles v Alameda Books, Inc.*, 535 US at 440 ["Our deference to the evidence presented by the city of Los Angeles is the product of a careful balance between competing interests. . . . We are also guided by the fact that *Renton* (*v Playtime Theatres, Inc.*, 475 US 41, 48-50 [1986]) requires that municipal ordinances receive only intermediate scrutiny if they are content neutral"]).

Pursuant to CPLR 4213 (b), a trial court "should set forth those ultimate or essential facts relied upon in reaching its decision" (*General Instrument Corp. v Consolidated Edison Co. of N.Y.*, 99 AD2d 460, 461 [1984]; *see also IBE Trade Corp. v Litvinenko*, 16 AD3d 132 [2005] [holding that a trial court should make findings of fact essential to support its determination on the issue]). "Mere conclusions" are insufficient as a matter of law; the facts upon which the conclusions rest must be stated (*see Davin v Isman*, 228 NY 1, 10 [1920] ["Facts justifying such conclusion should be found to the end that this court . . . should be able to ascertain whether such conclusion is supported by facts found"]). Otherwise, "intelligent appellate review is impossible if the appellate court cannot ascertain on what facts and conclusions of law the lower court rested its decision" (*Weckstein v Breitbart*, 111 AD2d 6, 7 [1985]). Indeed, given the scale of the trial record below, which runs into the hundreds of pages, it is impossible for this Court to properly review Supreme Court's conclusions of law without the benefit of established findings of fact (*id.* at 8 ["Without the benefit of established findings of fact and given the poor shape of the trial record below, which includes hundreds of pages of documents, it is impossible for this court to (make a determination as to one of the causes of action)"]). This Court will therefore remit the matter to Supreme Court for a decision setting forth its findings of fact as to the plaintiffs' facial challenge. In so doing, we briefly outline the standard that Supreme Court must follow on remittitur in considering the plaintiffs' challenge to the 2001 Amendments.

## Nature of the Proof

### Criteria

In assessing the validity of the 2001 Amendments, Supreme Court needed to compare "self-identified" 60/40 businesses with the adult businesses discussed in the DCP study, other studies and case law so as to determine whether the 60/40 businesses retained a predominant focus on sexually explicit materials. In so doing, Supreme Court needed to determine the particular characteristics associated with the promotion of sexually explicit materials.[7] The negative characteristics identified by the Supreme Court would serve as a baseline against which

---

**7.** The uses studied in the DCP Study as well as other studies and case law have been shown to cause negative secondary effects. If similar uses are found to be present in 60/40 establishments, then the City will not be required to of-

the "so transformed" issue could be adjudicated. Using that baseline, Supreme Court would then need to determine whether the 60/40 businesses had a similar predominant focus on sexually explicit materials.

In establishing the criteria by which the current uses can be compared to the uses studied in 1994, the DCP Study is a helpful starting point.[8] Though that study focused on the consequences of significant concentrations of adult businesses emphasizing sexually explicit materials and not the particular attributes that caused secondary effects, it did highlight some of the attributes that define an adult business. Specifically, it noted that establishments might qualify as being of an adult nature if they (1) exclude minors by reason of age or (2) sell materials emphasizing "specified sexual activities" or "specified anatomical areas."[9] In addition to those salient characteristics, the study placed special emphasis on the presence of adult signs that were larger than those of nearby nonadult businesses.

Based on the DCP Study, it is possible to discern the relevant characteristics of adult uses that can be linked to a focus on sexually explicit materials. For example, the presence of large signs advertising adult content may indicate a predominant focus on promoting sexually explicit materials. The same is true of a significant emphasis on the promotion of materials exhibiting "specified sexual activities" or "specified anatomical areas," as evidenced by a large quantity of peep booths featuring adult

---

fer a new study to establish the presence of secondary effects because it can point to the findings contained in the DCP Study as well as other studies and case law to establish such effects.

**8.** Of course, the City also has the prerogative of proffering surveys and case law from around the country discussing establishments with a predominant focus on sexually explicit materials to establish some other baseline upon which the "so transformed" issue can be adjudicated.

**9.** The study referred to the Planning and Zoning Code of Los Angeles, which defined "specified anatomical areas" as including: "[l]ess than completely and opaquely covered human genitals, pubic region, buttocks, anus or female breasts below a point immediately above the top of the areolae" or "[h]uman male genitals in a discernibly turgid state, even if completely and opaquely covered" (DCP Study at 2). This language was echoed in the 1995 Resolution.

The study also referred to the Los Angeles code's definition of "specified sexual activities" as including

> "(a) The fondling or other erotic touching of human genitals, pubic region, buttocks, anus or female breasts; (b) Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy; (c) masturbation, actual or simulated; or (d) Excretory functions as part of or in connection with any activities set forth in (a) through (c) above" (DCP Study at 2).

films.[10] Other indicators of a predominant focus on sexually explicit materials might be the exclusion of minors from the premises on the basis of age or difficulties in accessing nonadult materials.[11] In using the DCP Study to assess the constitutionality of the 2001 Amendments, Supreme Court should consider the extent to which 60/40 businesses have such attributes in determining whether they have a predominant focus on sexually explicit materials.

## City's Burden

■ The City has proffered evidence in support of its claim that 60/40 businesses displayed a predominant, ongoing focus on sexually explicit materials or activities. On remittitur, Supreme Court is to assess whether that evidence, and any additional evidence that the City wishes to adduce, entitle it to a judgment in its favor on the basis of the criteria outlined above. In so doing, it is necessary to recall that "very little evidence is required" to uphold the constitutionality of the 2001 Amendments[12] (*For the People*, 6 NY3d at 80 ["On the question of how much evidence was required to support an ordinance regulating adult businesses, Justice Kennedy agreed with the plurality that '(a)s to this, we have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required' " (quoting *Los Angeles v Alameda Books, Inc.*, 535 US at 451 [Kennedy, J., concurring])]). Nonetheless, the City's evidence must be relevant to the "so transformed" issue. That is, it must also establish that materials that form the basis of its justification for the 2001 Amendments are indeed of an adult character.[13] The evidence presented

---

**10.** Notably, the 1995 Resolution, which was largely based on the DCP Study and upheld by the Court of Appeals as a constitutionally valid enactment (*see Stringfellow's of N.Y.*, 91 NY2d 382 [1998]), was directed against uses that exhibited such characteristics.

**11.** *Id.*

**12.** For example, a consistent finding by Supreme Court that most, though not necessarily all, 60/40 establishments (1) exclude minors, (2) have large signs advertising sexually explicit adult materials and/or (3) emphasize the promotion of materials exhibiting "specified sexual activities" or "specified anatomical areas" over nonadult materials will be more than enough evidence to justify the City's 2001 ordinances on the basis of the DCP Study.

**13.** For example, the City cannot simply point to the presence of peep booths as establishing that there is an ongoing sexually explicit use. It must show that the peep booths are being used to promote sexually explicit adult materials. To do otherwise could potentially restrain the exercise of legitimate speech (*see e.g. City of New York v S&H Book Shop*, 41 AD2d 637 [1973] ["The exhibition of motion pictures by means of coin-operated projection

by the City must also present a fair snapshot of the businesses that are the object of its claim.

Plaintiffs' Rebuttal

██ Supreme Court erred in finding that "[a]lthough the plaintiffs have devoted quite a substantial portion of their brief to proving that these reconstituted 60/40 clubs no longer resemble their pre-1995 forbears, this argument is entirely irrelevant and will be accorded no weight" (*Ten's Cabaret*, NYLJ, Apr. 19, 2010, at 34, col 1). In so doing, it deprived plaintiffs of their opportunity to be heard (*see Matter of Quinton A.*, 49 NY2d 328, 334 n [1980] ["The essence of procedural due process is that a person must be afforded notice and an opportunity to be heard before government may deprive him of liberty or a recognized property interest"]). Specifically, it deprived them of their ability to cast doubt on the City's rationale for its ordinance (*see For the People*, 6 NY3d 63).

On remittitur, Supreme Court must therefore address any relevant evidence proffered by the plaintiffs to show that there has been a significant change in the character of 60/40 businesses.[14] Nonetheless, Supreme Court is not to consider evidence that is irrelevant to the question of whether those establishments continue to have a predominant focus on sexually explicit materials.[15]

Quantum of Evidence—Intermediate Scrutiny

██ Notwithstanding the simplified nature of proof required of municipalities by the United States Supreme Court and the Court of Appeals, "[i]mposing a level of intermediate scrutiny . . . requires more conviction of the connection between legislative ends and means than does the rational basis standard, but only in the sense of 'evidence . . . [that] is reasonably believed to be relevant' to the secondary effects in question" (*For the People*, 6 NY3d at 81 [citations omitted]). On remittitur, Supreme Court should therefore assess the City's evidence in light of this somewhat heightened standard.

---

machines is encompassed within the First Amendment of the United States Constitution"]).

14. For example, if Supreme Court relies upon the DCP Study to establish the criteria by which it evaluates the 2001 Amendments, it should address plaintiffs' claims that the signs have been significantly modified to eliminate any emphasis on adult material and that customers are not confronted with predominantly adult materials when they first enter the stores.

15. Notably, any evidence proffered with the intention of relitigating the secondary effects issue should be excluded.

### As-Applied Challenge

■ The plaintiffs in *Ten's Cabaret* also mounted an as-applied challenge to the 2001 Amendments. Although the plaintiffs concede that the as-applied challenge was "inartfully pleaded" the law is, of course, well settled that pleadings are to be construed liberally (CPLR 3026 ["Pleadings shall be liberally construed. Defects shall be ignored if a substantial right of a party is not prejudiced"]).[16] To be sure, during a colloquy, Supreme Court itself posed the question of what might happen if it "decide[d] that several clubs don't have a dominant sexual purpose in their activities, but other clubs do[;] suppose half of them do and half of them don't," and the plaintiffs specifically raised the issue of an as-applied challenge during the same colloquy.[17] Thus, there is no merit to the City's contention that the issue was neither raised nor preserved.

The City notes that in *Stringfellow's of N.Y.*, the Court of Appeals stated that the 1995 Resolution was applicable even to establishments that "may legitimately claim that their facilities do not contribute to urban blight" (91 NY2d at 401). Significantly, the challenge in *Stringfellow's* was a facial challenge, not an as-applied challenge. Thus, the Court found it acceptable that some of the businesses not contributing to urban blight were necessarily swept up in the law (*see id.* ["To the extent that certain individual establishments may legitimately claim that their facilities do not contribute to urban blight, their argument does not impair the constitutionality of the challenged legislation, since '(t)he validity of a statute . . . is not to be determined from its effect in a particular case, but upon its general purpose and its effect to that end" (quoting *City of Rochester v Gutberlett*, 211 NY 309, 316 [1914])]). Nothing in the Court's decision forecloses an "as-applied" challenge to the ordinance, however.

---

**16.** The relevant paragraph of the pleadings by Ten's Cabaret reads: "The [2001] Amendments seek to close Ten's and other similarly-situated establishments, even though there is no evidence that Ten's present configuration causes any adverse secondary effects and, in particular, causes crime or lowers property values."

**17.** In response to the court's question, plaintiff's counsel observed that "[t]he very first cause of action I believe is an as applied challenge. The plaintiffs contend that the 200[1] amendments are invalid, unconstitutional, and an illegal restriction and denial of plaintiff's constitutional right inter alia to express sell, present and disseminate protected forms of speech. So the very first cause of action focuses on the plaintiff's own constitutional rights. *There is also a facial challenge.* So there are both challenges" (emphasis added).

■ Indeed, while the 2001 Amendments might be constitutional in most situations, there may be instances where the application of the ordinance might be an unconstitutional abridgment of First Amendment protections. In *New York v Ferber* (458 US 747 [1982]) the United States Supreme Court addressed how a legislative enactment should be treated when the number of potentially unconstitutional applications of a statute is small compared to the number of legitimate applications. After upholding a child pornography statute against a facial overbreadth challenge, the Court permitted an "as-applied" challenge against the constitutionality of the statute (*id.* at 773-774 ["whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied" (quoting *Broadrick v Oklahoma*, 413 US 601, 615-616 [1973])]). Given the possibility that the 2001 Amendments could curtail legitimate free speech, an as-applied challenge would be an appropriate means to challenge the application of the 2001 Amendments if the facial challenge against the ordinance fails.

Supreme Court's decision states very few, if any, facts that can be used by this Court to resolve plaintiff's as-applied challenge. Instead, Supreme Court simply stated that "[m]erely because [plaintiffs] have introduced evidence that some topless clubs may not have an ongoing focus on adult activities, does not defeat the pattern established by [the City] of topless clubs having an ongoing focus of adult activities" (*Ten's Cabaret*, NYLJ, Apr. 19, 2010, at 34, col 1).

Thus, Supreme Court gives no indication of any facts it took into account in arriving at its decision on the as-applied challenge, or whether it even considered them. Indeed, neither the decision nor the judgment makes any factual findings to help resolve the question of whether only some of the clubs were found to have a predominantly sexual focus or whether all of them were. This is particularly significant inasmuch as Supreme Court itself raised the question of differences between the clubs, and then requested briefing on the as-applied issue.

The result of Supreme Court's decision is that some of the nonsham clubs could be put out of business by a law that, in fairness, may not apply to them. As the plaintiffs in *Ten's Cabaret* preserved an "as applied" challenge, this Court will therefore remit the matter to Supreme Court for a decision setting forth its findings of fact as to the plaintiffs' as-applied challenge (*General Instrument Corp.*, 99 AD2d at 461; *see also IBE Trade Corp.*, 16 AD3d 132).

Accordingly, the judgment of the Supreme Court, New York County (Louis B. York, J.), entered May 19, 2010, insofar as appealed from, finding that the 2001 Amendments to the Zoning Resolution of the City of New York are constitutional with regard to bookstores and video stores, should be reversed, on the law, without costs, the finding of constitutionality vacated, and the matter remanded for further proceedings consistent with this opinion. The order and judgment (one paper) of the same court and Justice, entered April 23, 2010, finding that the 2001 Amendments to the Zoning Resolution are constitutional with regard to topless night clubs and bars, should be reversed, on the law, without costs, the finding of constitutionality vacated, and the matter remanded for further proceedings consistent with this opinion.

GONZALEZ, P.J., SAXE, CATTERSON and MANZANET-DANIELS, JJ., concur.

Judgment, Supreme Court, New York County, entered May 19, 2010, reversed, on the law, without costs, the finding of constitutionality vacated, and the matter remanded for further proceedings consistent with this opinion. Judgment and order (one paper), same court, entered April 23, 2010, reversed, on the law, without costs, the finding of constitutionality vacated, and the matter remanded for further proceedings consistent with this opinion.